UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEONDRE D. GAINES,

              Petitioner,

                                    CASE NO. 13-cv-13605

v.

                                    PAUL D. BORMAN

SHARON L. BURT,                  UNITED STATES DISTRICT JUDGE

              Respondent.

_____/

**OPINION AND ORDER
DENYING THE PETITION FOR WRIT OF HABEAS CORPUS,
DENYING A CERTIFICATE OF APPEALABILITY, AND
GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Petitioner Deondre D. Gaines, a state prisoner at Muskegon Correctional Facility

in Muskegon, Michigan, has filed a *pro se* application for the writ of habeas corpus under

28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions for first-

degree murder, conspiracy to commit first-degree murder, two assault crimes, and two

firearm crimes. Petitioner raises seven claims regarding the denial of his motion for a

directed verdict of acquittal, the admission of hearsay testimony, the sufficiency of the

evidence, trial counsel's performance, the trial court's handling of the case, the

prosecutor's conduct, and the cumulative effect of the alleged errors. Respondent Sharon

L. Burt urges the Court through counsel to deny the petition. The Court agrees that

Petitioner's claims do not warrant habeas relief. Accordingly, the habeas petition will be

denied.

## I.  Background

### A.  The Charges and Trial Testimony

Petitioner was charged in Saginaw County, Michigan with the following six crimes:  conspiracy to commit first-degree (premeditated) murder, Mich. Comp. Laws § 750.157a, Mich. Comp. Laws § 750.316(1)(a); first-degree (premeditated) murder, Mich. Comp. Laws § 750.316(1)(a); two counts of assault with intent to commit murder, Mich. Comp. Laws § 750.83; one count of possessing a firearm during the commission of, or attempt to commit, a felony (felony firearm), Mich. Comp. Laws § 750.227b; and one count of carrying a concealed weapon, Mich. Comp. Laws § 750.227.  The concealed-weapon charge was later changed to read "carrying a pistol in an automobile."

The Michigan Court of Appeals provided the following brief summary of the facts:

> This case involves a cycle of gang violence between [the city of] Saginaw's rival North Side and South Side gangs.  North Side gang member Jordan Cramton was shot in the face by Orlando Young.  North Side gang members, including defendant, learned of this, and decided to retaliate. While defendant and fellow gang members were searching for Young to "get" him, defendant shot Patrick Price, who survived.  Later defendant chased and shot Jimahle Donald in the back, killing him.  After learning that police knew of the crimes, defendant and others arranged to dispose of the gun used to assault Price and kill Donald.

*People v. Gaines*, No. 274721, 2009 WL 103229, at *1 (Mich. Ct. App. Jan. 15, 2009) (unpublished).

The shooting of Patrick Price and Jimahle Donald occurred on January 3, 2006. Petitioner and his alleged co-conspirators were involved in a third shooting on the same

2

day.  The third shooting involved an assault on Orlando Young by Devon Bishop.[1]
Petitioner was charged as an aider and abettor in that shooting.  All three shootings
occurred within approximately seventy-five minutes of each other.

Petitioner was tried before a jury in Saginaw County Circuit Court.  The critical
evidence against him came from three of the four other people who participated in the
crimes:  Devon Bishop, Demetre Merrill, and Kevin Simon.[2]

### 1. Devon Bishop

Devon Bishop testified that he and Petitioner were associated with the North Side
Gang and that, on January 3, 2006, he (Bishop) learned that his friend Jordan Cramton
had been shot in the face.  He was planning to visit Cramton in the hospital when he
received a phone call from Kevin Simon who asked him for a gun.  Bishop then grabbed
his loaded nine-millimeter gun, and Kevin Simon drove up in his Oldsmobile Bravada
with Petitioner.  Bishop and his friend Demetre Merrill got in the vehicle.  Petitioner's
brother, Dre'Vonne Sherman, also got in the vehicle.  Simon asked Bishop whether he
had the gun, and Bishop assured him that he did.  Petitioner was seated in the front
passenger seat when Simon asked about the gun.

---

[1]  In the record before the Court, Young is also referred to as Lando Young, and Orlando
Byrd.  The Court has adopted the name used by Petitioner and the Michigan Court of
Appeals.

[2]  Another participant in the crimes was Petitioner's brother Dre'Vonne Sherman, who
refused to testify at Petitioner's trial even though he had already pleaded guilty to various
crimes and subsequently was given testimonial immunity from prosecution.  *See* 9/26/06
Trial Tr. at 165-78, ECF No. 7-11, Pg ID 790-93; 9/28/06 Trial Tr. at 19-28, ECF No. 7-
13, Pg ID 874-77.

The five young men then drove to Glenwood Street where Petitioner told Simon to stop the car.  Petitioner and Bishop got out of the car.  Petitioner asked for the gun and said that he saw "D-Black" in the doorway.  Bishop handed the gun to Petitioner who knocked on a house door and identified himself as "D."  Shortly afterward, Bishop heard a gunshot and ran back to the vehicle.

Petitioner also returned to the vehicle and from there the group went to Webber Street where Dre'Vonne Sherman said that he saw some more guys.  Petitioner then jumped out of the vehicle, chased the guy, who turned out to be Jimahle Donald, and shot Donald in the back as Donald was running away from Petitioner.  When Petitioner got back in the vehicle, someone asked him whether he shot the person.  Petitioner responded, "Yeah," and said that he thought he had shot someone named Wali. Petitioner returned the gun to Bishop.

Next, the group went to the subdivision known as Sheridan Park.  Kevin Simon stopped at a residence and went inside the house.  The other four young men walked around the corner looking for the guy who shot Jordan Cramton.  They saw somebody hiding behind a house and ran up to him.  Bishop fired the gun at a person that he thought was Orlando Young.  Petitioner and the others were three feet away from Bishop when Bishop fired his gun at Young.  All five of the young men got back in the vehicle and returned to Bishop's home.  Four days later on January 7, 2006, Petitioner contacted Bishop and told him to throw the gun in the river.

4

Continuing, Bishop testified that he spoke with the police on January 8 and again on January 9, 2006.  At first, he lied to the police about shooting at Orlando, but on January 9, 2006, he changed his story, told the police what had happened, and admitted shooting at Orlando.  During July of 2006, he pleaded guilty to second-degree murder, two counts of assault with intent to murder, felony firearm, and carrying a dangerous weapon in a motor vehicle.  Bishop had not been sentenced when he testified at Petitioner's trial, but he claimed that no promises were made to him regarding his sentence.

### 2. Demetre Merrill

Demetre Merrill corroborated Devon Bishop's testimony about the events of January 3, 2006, although he claimed that it was Petitioner, not Kevin Simon, who had asked Bishop in the vehicle whether Bishop had a gun.  Merrill also explained that "D-Black" was affiliated with the South Side and that, after riding by the house where D-Black stayed, Petitioner and Devon Bishop got out of the vehicle.  Shortly afterward, Merrill heard one gunshot and saw Petitioner and Bishop run back to the vehicle.  The group then drove to Webber Street where Petitioner ordered Kevin Simon to stop the vehicle near a guy in a fur coat who was walking down the street and talking on a cell phone.  Petitioner hopped out of the vehicle and shot the guy in the back as the guy was running away from Petitioner.

Back in the vehicle, Petitioner handed the gun to Bishop, and the group went to Sheridan Park.  Four of them got out of the vehicle and walked around the corner,

looking for Orlando Young. Bishop fired six or seven shots at someone that he thought was peeking around the house.

Merrill explained to the jury that, on the way home from these shootings, Kevin Simon was telling everybody not to say anything. Petitioner also said that, as long as they did not say anything, they would be alright. Petitioner's mother later told Merrill to get rid of everything, but when Merrill attempted to get rid of the gun, Petitioner took everything with him.

Merrill stuck with the plan to remain silent, but was later arrested. In July of 2006, he negotiated a plea agreement, which required him to plead guilty to accessory after the fact to first-degree murder and assault with intent to murder. The other charges against him were dismissed, and there was no sentence agreement.

### 3. Kevin Simon

Kevin Simon testified that he was granted immunity from prosecution in return for his testimony. He claimed that he informed Petitioner about Jordan Cramton being shot in the face by Orlando Young and that Petitioner was present during a discussion about doing a "flight," which is a shooting or retaliation.

Simon also testified about the subsequent shootings of Kevin Price, Jimahle Donald, and Orlando Young. Significantly, he claimed that the purpose of going to Sheridan Park was to "get" Orlando Young and that the word "get" meant to shoot or kill. Simon maintained that he did not intend to do anything and that the group did not use the word "kill," nor mention killing Young, but that they all knew what was going on and

6

that they were going to shoot or kill Young.  Simon also testified that the shooting of Jamahle Donald was a mistake, as Donald was not even associated with the neighborhood where the group went.

### 4.  Patrick Price

Patrick Price testified that he was visiting his goddaughter at 1903 Glenwood Street on January 3, 2006, when someone knocked on the door.  He went to the back door and asked who it was.  The person responded that he was looking for "D," which is the nickname that Price used for his cousin Dequavis Smith who often stayed with his grandmother at 1903 Glenwood.  Price opened the door and saw Petitioner, whom he did not know at the time.  Price then turned and called down the stairs for Dequavis.  When he turned back to face the man at the door, the man had a gun aimed at Price's chest.  Price tried to shut the door, but the man fired a bullet, which ricocheted off the door and entered his stomach.  He ran down the hallway and hit the alarm system.  He thought that someone else called the police.

Price explained that, on January 6, 2006, the police showed him a set of photos and that he identified photo number eleven as the shooter.  At a subsequent court hearing, he identified Petitioner as the man who shot him.  He later learned from a newspaper article that he had picked the wrong person and that the man depicted in photo number eleven was Petitioner's brother who was a year older than Petitioner.

### 5. Dr. Kanu Virani and Ronald Ainslie

Forensic pathologist Kanu Virani testified that Jimahle Donald died from blood loss due to a gunshot wound to his back. Ronald Ainslie was a firearms expert who testified that the four casings found at the shooting sites came from the same nine-millimeter firearm.

Petitioner did not testify or present any witnesses. His defense was that there was a lack of evidence, that there never was a conspiracy, and that there was no intent to kill.

## B. The Verdict, Sentence, Appeals, and Habeas Petition

On the murder count, the trial court instructed the jury on the lesser-included offense of second-degree murder, and on the assault counts, the trial court instructed the jury on assault with intent to do great bodily harm less than murder. On September 29, 2006, however, the jury found Petitioner guilty, as charged, of conspiracy to commit first-degree murder, first-degree murder, two counts of assault with intent to commit murder, felony firearm, and carrying a pistol in an automobile. On November 8, 2006, the trial court sentenced Petitioner to two years in prison for the felony-firearm conviction, followed by concurrent terms of life imprisonment for the conspiracy, murder, and assault convictions, and forty to sixty months in prison for the remaining pistol conviction.

On direct appeal from his convictions, Petitioner argued that the trial court erred in (1) denying his motion for a directed verdict and (2) overruling defense counsel's objection to the admission of out-of-court statements made to Devon Bishop. These

8

arguments now form Petitioner's first and second habeas claims.  The Michigan Court of Appeals was not persuaded by Petitioner's arguments and affirmed his convictions in an unpublished decision.  *See Gaines*, Michigan Court of Appeals No. 274721, 2009 WL 103229.  On June 23, 2009, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Gaines*, 483 Mich. 1113 (2009).

Petitioner filed a motion for relief from judgment in which he raised the issues that now form his third, fourth, fifth, sixth, and seventh claims.   The trial court denied  his motion, *see* Order and Opinion of the Court (Saginaw Cty. Cir. Ct. Mar. 26, 2012), and the Michigan Court of Appeals denied leave to appeal.  *See People v. Gaines*, No. 310548 (Mich. Ct. App. Nov. 8, 2012).  The Michigan Supreme Court likewise denied leave to appeal.  *See People v. Gaines*, 494 Mich. 868 (2013).

On August 21, 2013, Petitioner filed his habeas corpus petition.  He argues that: (1) the trial court erred by denying his motion for a directed verdict of acquittal on the conspiracy charge and the assault charge involving Orlando Young; (2) the trial court erred by overruling a defense objection to the admission of out-of-court statements; (3) there was insufficient evidence to support his convictions for first-degree murder and the second assault charge; (4) trial counsel provided ineffective assistance; (5) the trial court failed to govern the trial in a proper manner; (6) the prosecutor engaged in misconduct; and (7) the cumulative effect of the errors deprived him of a fair trial.

Respondent maintains that Petitioner's claims are time-barred, procedurally defaulted, not cognizable on habeas review, or meritless.   A procedural default is not a

9

jurisdictional matter. *Trest v. Cain*, 522 U.S. 87, 89 (1997). The statute-of-limitations defense also is not jurisdictional. *Holland v. Florida*, 560 U.S. 631, 645 (2010) (quoting *Day v. McDonough*, 547 U.S. 198, 205 (2006)). And because the Court finds it more efficient to adjudicate the merits of Petitioner's claims than to determine whether the claims are procedurally defaulted or untimely, the Court will proceed to analyze Petitioner's claims, using the following standard of review.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the

10

> state court identifies the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for

Part II). "[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly. Rather, that application must

also be unreasonable." *Id*. at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court

rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court

decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24

(2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010). "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as

'fairminded jurists could disagree' on the correctness of the state court's decision."

*Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the

state court's ruling on his or her claim "was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id*. at 103.

## III. Discussion

### A. Denial of the Motion for a Directed Verdict of Acquittal

Petitioner alleges that the trial court erred by denying his motion for a directed verdict of acquittal on the charges of conspiracy to commit first-degree murder and assault with intent to murder Orlando Young, the man suspected of shooting Jordan Cramton.  Defense counsel moved for a directed verdict at the close of the prosecution's case, *see* 9/29/06 Trial Tr., at 22-29, ECF No. 7-14, Pg ID 935-37, and after the jury reached its verdict, *see* 11/8/06 Sentencing Tr. at 4-11, ECF No. 7-15, Pg ID 978-80. The trial court denied the first motion because it believed there was sufficient evidence for a reasonable trier of fact to conclude that the prosecutor had proved the elements of the crimes.  The court denied the second motion because, in its opinion, the evidence against Petitioner was overwhelming.

The Michigan Court of Appeals subsequently reviewed Petitioner's claim on direct review and pointed out:

> There was testimony that defendant was with members of his gang on the evening in question and that the group sought to retaliate for the shooting of Cramton, allegedly by Young . . . .   In addition, defendant was among the group stalking Young in Sheridan Park.

*Gaines*, 2009 WL 103229, at *1.  The Court of Appeals also stated that, "[a]lthough there were inconsistencies in the witnesses' testimony concerning the exact harm intended against Young, these discrepancies in the witnesses' testimony do not negate the jury's conclusion that defendant was guilty beyond a reasonable doubt on both of the

12

challenged counts." Finally, the Court of Appeals stated that the jury could conclude from the evidence that, "despite denials by some gang members at trial, defendant and his coconspirators intended to kill Young." *Gaines*, 2009 WL at *1.

Petitioner maintains that there may have been a plan to harm Young, but there was no evidence that any of the men planned to kill Young. Regarding the assault charge, Petitioner alleges that there was no proof the men actually assaulted Young, that they intended to kill Young, or that Petitioner aided and abetted the assault.[3]

### 1. Legal Framework

In Michigan, "the trial judge when ruling on a motion for a directed verdict of acquittal must consider the evidence presented by the prosecution up to the time the motion is made, view that evidence in a light most favorable to the prosecution, and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v. Hampton*, 407 Mich. 354, 368 (1979) (internal and end citations omitted). This rule of law is based on *Jackson v. Virginia*, 443 U.S. 307 (1979), in which the Supreme Court held that the question on review of the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

---

[3] Young did not testify at Petitioner's trial. An arrest warrant was issued for him as a result of the shooting of Jordan Cramton, but, as of the date of Petitioner's trial, he remained at large. (9/28/06 Trial Tr., at 116, ECF No. 7-13, Pg ID 899.)

> Criminal conspiracy in Michigan
>
> is a mutual understanding or agreement between two or more persons, expressed or implied, to do or accomplish some criminal or unlawful act.
>
> . . . .   All the requisite elements of the crime of conspiracy are met when the parties enter into the mutual agreement, and no overt acts necessarily must be established. . . .
>
> . . . . To prove a conspiracy to commit murder, it must be established that each of the conspirators [had] the intent required for murder and, to establish that intent, there must be foreknowledge of that intent.

*People v. Hamp*, 110 Mich. App. 92, 102-03 (1981) (internal citations omitted).

The elements of assault with intent to commit murder are "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v. Hoffman*, 225 Mich. App. 103, 111 (1997).  An assault is "either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v. Starks,* 473 Mich. 227, 234 (2005).

> [O]ne may, of course, draw reasonable inferences to assist in making the finding of an actual intention to kill.  The requisite intent may be gleaned from the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made.

*People v. Brown*, 267 Mich. App. 141, 149 n.5 (2005) (citations and quotation marks omitted).

> "Aiding and abetting" describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime. . . .  To support a finding that a defendant aided and abetted a crime, the prosecutor must

14

> show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement.  An aider and abettor's state of mind may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime.

*People v. Carines*, 460 Mich. 750, 757-58 (1999) (quoting *People v. Turner*, 213 Mich. App. 558, 568-69 (1995)).

### 2. Application

The testimony in this case established that Petitioner and his friends planned to retaliate against Orlando Young and that Petitioner and his friends went in search of Young, armed with a loaded gun.  Petitioner, however, contends that there was insufficient evidence of a plan to kill Young.

It is true that Devon Bishop and Demetre Merrill denied having an intent to kill Young.  (9/22/06 Trial Tr. at 143-44, 146, ECF No. 7-10, Pg ID 719; 9/27/06 Trial Tr. at 67, 76,  ECF No. 7-12, Pg ID 828, 830.)  But Kevin Simon testified that the purpose of going to Sheridan Park was to shoot and kill Young.  (9/27/06 Trial Tr. at 120, ECF No. 7-12, Pg ID 841.)  Simon also testified that everyone knew what was going on and that they were going to shoot or kill Young.  (*Id*. at 141, ECF No. 7-12, Pg ID 846.)  Thus, there was sufficient evidence of a conspiracy to kill Young.

Petitioner also claims there was no proof that the men actually assaulted Young, that they intended to kill Young, or that Petitioner aided and abetted the assault on

15

Young.  Devon Bishop conceded at one point during the trial that he did not know whether he actually had been shooting at Young.  (9/22/06 Trial Tr. at 145, ECF No. 7-10, Pg ID 719.)  He testified elsewhere, however, that he thought he shot at Young and that Petitioner was within an arm's length of him when he was shooting at Young.  (*Id.* at 121, ECF No. 7-10, Pg ID 713.)   And, as noted in the previous paragraph, Kevin Simon testified that everyone knew they would shoot or kill Young.  Thus, there was sufficient evidence of an assault with intent to kill Young.

A rational trier of fact could have determined from the evidence taken in the light most favorable to the prosecution that Petitioner conspired with his acquaintances to kill Orlando Young and that he aided and abetted Devon Bishop in assaulting Young with an intent to kill Young.  Therefore, the trial court's denial of Petitioner's motions for a directed verdict of acquittal and the state appellate court's rejection of Petitioner's claim were not contrary to, or unreasonable applications of, *Jackson*.  Petitioner has no right to relief on the basis of his first claim.

**B.  Alleged Hearsay**

Petitioner alleges next that the trial court erred when it overruled a defense objection to testimony regarding out-of-court statements made to Devon Bishop. Petitioner claims that the hearsay testimony was inadmissible because the prosecution failed to establish the existence of a conspiracy through independent evidence before eliciting hearsay testimony about the conspiracy.

16

This claim arose when Devon Bishop testified that Kevin Simon called him on January 3, 2006 and asked for Bishop's gun.  Bishop claimed that Petitioner was with Simon at the time, and when Bishop said that he wanted to go along with Simon, Simon said he would be there in a minute.  Defense counsel objected to the testimony, but after a bench conference, he agreed to take up the matter at a later time.  (9/22/06 Trial Tr. at 61-63, ECF No. 7-10, Pg ID 698-99.)

Later, in the absence of the jury, defense counsel argued that a co-conspirator's statements are admissible under Michigan Rule of Evidence 801(d)(2)(E), but only if the prosecutor shows the existence of a conspiracy through evidence exclusive of the statements being offered.  Defense counsel nevertheless suggested that the court allow the statements to come in and then, whenever it was appropriate, make a finding as to whether there was independent evidence of a conspiracy, such that the statements were admissible.  The trial court ruled that there was an independent showing of the existence of a conspiracy.  (*Id*. at 79-83, ECF No. 7-10, Pg ID 703-04.)

The Michigan Court of Appeals determined on review of Petitioner's claim that Petitioner waived his challenge to the order of proof by suggesting that the trial court allow the statements to be admitted in evidence and subsequently determine whether there was independent evidence of a conspiracy.   The Michigan Court of Appeals also determined that some of the out-of-court statements were not hearsay because they were not offered for a substantive purpose.  Finally, the Court of Appeals stated that there was

17

evidence establishing the existence of a conspiracy to kill Orlando Young, independent of the inadmissible hearsay testimony.

This Court finds no merit in Petitioner's claim because it is based on an alleged violation of Michigan Rule of Evidence Rule 801(d)(2)(E), which says: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy on independent proof of the conspiracy." "To the extent that any testimony and comments violated Michigan's rules of evidence, such errors are not cognizable on federal habeas review," *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009), because "[a] federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Habeas relief is not warranted here because Petitioner has alleged only a violation of state law.

## C. Sufficiency of the Evidence

The third habeas claim alleges that there was insufficient evidence to support Petitioner's convictions for first-degree murder and for assaulting Patrick Price with intent to kill Price. Petitioner first raised this issue in his motion for relief from judgment. The trial court mistakenly determined that the Michigan Court of Appeals had already reviewed the issue and, therefore, the issue was not properly before the trial

18

court.[4]  Because no state court adjudicated the merits of Petitioner's claim and the claim

is not procedurally defaulted, AEDPA deference does not apply and this Court must

review Petitioner's claim *de novo*.  *Scott v. Houk*, 760 F.3d 497, 504 (6th Cir. 2014)

(quoting *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)), *cert. denied sub nom.*

*Scott v. Fosberg*, 135 S. Ct. 1552 (2015).

As noted above, the relevant question on review of the sufficiency of the evidence

is "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt."  *Jackson*, 443 U.S. at 319 (emphasis in original).  The Supreme Court

has made clear that

> *Jackson* claims face a high bar in federal habeas proceedings because they
> are subject to two layers of judicial deference.  First, on direct appeal, "it is
> the responsibility of the jury—not the court—to decide what conclusions
> should be drawn from evidence admitted at trial.  A reviewing court may
> set aside the jury's verdict on the ground of insufficient evidence only if no
> rational trier of fact could have agreed with the jury."  *Cavazos v. Smith*,
> 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam).
> And second, on habeas review, "a federal court may not overturn a state
> court decision rejecting a sufficiency of the evidence challenge simply
> because the federal court disagrees with the state court. The federal court
> instead may do so only if the state court decision was 'objectively
> unreasonable.' "  *Ibid*. (quoting *Renico v. Lett*, 559 U.S. 766, ——, 130
> S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (*per curiam*).

---

[4]  On direct appeal, Petitioner challenged his convictions for conspiracy to commit first-degree murder and assault with intent to murder Orlando Young.  In his motion for relief from judgment, Petitioner challenged the underlying conviction for first-degree murder and his conviction for assault with intent to murder Patrick Price.

### 1. Premeditated Murder

Petitioner claims there was insufficient evidence to support his conviction for murdering Jimahle Donald. Petitioner points out that there was no physical evidence linking him to the murder. Petitioner also states that, while there may have been a plan to harm Orlando Young, there was no evidence of a plan to kill Jimahle Donald and there was no evidence that he premeditated the killing. Petitioner also contends that the evidence was merely circumstantial at best because no one saw him shoot Donald.

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. "To establish first-degree premeditated murder [in Michigan], the prosecution must prove that the defendant intentionally killed the victim and the act of killing was deliberate and premeditated." *People v. Haywood*, 209 Mich. App. 217, 229 (1995). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 31 Mich. App. 301, 329 (1971) (footnote omitted). "[P]remeditation and deliberation may be inferred from all the facts and circumstances surrounding the incident," *Haywood*, 209 Mich. App. at 229, including "the type of weapon used and the location of the wounds inflicted." *People v. Berry*, 198 Mich. App. 123, 128 (1993). There must be enough time for the defendant to take a second look at his actions, but this interval may be minimal. *People v. Gonzalez*, 178 Mich. App. 526, 531 (1989).

20

Petitioner's allegations that the evidence was circumstantial and that no one saw him shoot Donald are belied by the record. Devon Bishop testified that Petitioner jumped out of the vehicle, chased Jimahle Donald, and shot Donald in the back as Donald was running away from Petitioner. When Petitioner got back in the vehicle, someone asked him whether he shot the person. Petitioner responded, "Yeah." (9/22/06 Trial Tr. at 76-78, 117, ECF No. 7-10, Pg ID 702, 712.)

Demetre Merrill testified similarly. He said that Petitioner ordered Kevin Simon to stop the vehicle near a man who was walking down the street and talking on a cell phone. Petitioner then hopped out of the vehicle and shot the man in the back as the man was running away from Petitioner. When Petitioner returned to the vehicle, he did not appear to be sad or disappointed by what he had done. (9/27/06 Trial Tr. at 24-28, ECF No. 7-12, Pg ID 817-18.)

A rational trier of fact could have concluded from this evidence that Petitioner intended to shoot and kill Donald and that he had enough time to think about his actions and deliberate his choices. He deliberately asked Kevin Simon to stop his vehicle after someone in the vehicle spotted two men on the street. Petitioner then got out of vehicle, pursued Donald, and used a firearm to shoot him in the back. Although he apparently thought he was shooting someone else, "[w]here one intends to assault a certain person, but by mistake or accident assaults a different person, the crime so committed, if any, is the same as though the person originally intended to be assaulted had been assaulted." *People v. Hurse*, 152 Mich. App. 811, 813 (1986) (quoting CJI 17:1:05); *see also* 9/29/06

21

Trial Tr., at 101-02, ECF No. 7-14, Pg ID 955 (the state trial court's jury instruction on

transferred intent).   The Court therefore concludes that the evidence was sufficient to

convict Petitioner of murdering Jamahle Donald with premeditation and deliberation.

### 2. Assault with Intent to Murder Patrick Price

Petitioner asserts that there was insufficient evidence he assaulted Patrick Price

with intent to kill Price because Price was the only witness to the shooting and there was

no independent basis for Price's in-court identification.   Furthermore, Price did not see

the shooter's entire face, and he initially identified Petitioner's brother in a photo array.

Petitioner also contends that, because Price was not affiliated with a gang, there was no

motive to shoot him.

To prove the elements of assault with intent to commit murder, the prosecutor

must establish "(1) an assault, (2) with an actual intent to kill, (3) which, if successful,

would make the killing murder." *Hoffman*, 225 Mich. App. at 111.   No one disputed that

Patrick Price was assaulted by being shot, and, because he claimed that the shooter aimed

a gun at his chest, one could infer that the shooter had an actual intent to kill.   The

shooting, if successful, could have resulted in death, making the killing a murder.

Price's unsupported eyewitness testimony, if believed by the jury, was sufficient

to convict Petitioner.   *People v. Richards*, 76 Mich. App. 695, 698 (1977).   While it is

true that he initially identified Petitioner's brother in a photo array, he subsequently

identified Petitioner at the preliminary examination without any hesitation even though

three of Petitioner's co-defendants also were present and dressed in orange jail uniforms.

22

(9/28/06 Trial Tr. at 136-37, ECF No. 7-13, Pg ID 904.)  And, at the time, Price was

unaware that he had incorrectly identified Petitioner's brother as the shooter in a photo

array.  (*Id*. at 137-38, ECF No. 7-13, Pg ID 904.)

Furthermore, although Petitioner contends that he had no motive to shoot Price,

the prosecutor was not required to prove a motive for the shooting.  The evidence,

therefore, was sufficient to support Petitioner's conviction for assault with intent to

murder Patrick Price.

A rational trier of fact could have concluded from the evidence taken in the light

most favorable to the prosecution that Petitioner killed Jimahle Jordan with premeditation

and deliberation and that he assaulted Patrick Price with intent to murder him.  The Court

therefore concludes that, given the deference that must be given to the jury's decision,

Petitioner's convictions did violate his constitutional right to due process.  Habeas relief

is not warranted on his sufficiency-of-the-evidence claim.

**D.  Trial Counsel**

Petitioner alleges next that his trial attorney was ineffective.  Specifically,

Petitioner contends that trial counsel failed to (1) ask the trial court to rule on a previous

objection and to declare a mistrial, (2) make a reasonable investigation and produce the

emergency room doctor, and (3) produce an alibi witness.

An attorney is constitutionally ineffective if counsel's "performance was

deficient" and "the deficient performance prejudiced the defense."  *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984).  The "deficient performance" prong "requires

showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

The "prejudice" prong of the *Strickland* test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693).

Review under AEDPA, moreover, is "doubly deferential" when the petitioner alleges ineffective assistance of counsel,

> because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Burt v. Titlow*, 571 U.S. ——, ——, 134 S.Ct. 10, 17, 187 L.Ed.2d 348 (2013) (quoting *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); internal quotation marks omitted). In such circumstances, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt." *Burt, supra*, at ——, 134 S. Ct., at 13.

*Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (*per curiam*).

### 1. Failure to Ask for a Ruling or Mistrial

Petitioner claims that his trial counsel was ineffective for failing to insist that the trial court declare a mistrial after counsel objected to the prosecutor's alleged bolstering

of Devon Bishop's credibility and sought a mistrial.  This claim arose during the prosecutor's direct examination of Detective Andrew Carlson.  The prosecutor asked Detective Carlson whether Kevin Simon had provided the police with information that was substantially the same as what he said at Petitioner's trial.  Before the detective could answer, defense counsel objected and moved for a mistrial on the ground that the prosecutor was vouching for his witness and invading the province of the jury.

The jury was then excused, and in its absence, the trial court sustained defense counsel's objection to the form of the question.  The court also stated that it was up to the jury to determine whether Kevin Simon's testimony was consistent with what he said previously.  The prosecutor, however, maintained that the testimony was not hearsay under the rules of evidence because it was offered to rebut a charge of recent fabrication.  After defense counsel disagreed, the trial court promised to take a look at the pertinent rule and let the attorneys know his decision.  The jurors then returned to the courtroom, and the trial court informed them that it was sustaining defense counsel's objection to the question about the consistency of a witness's testimony.  (9/28/06 Trial Tr. at 142-49, ECF No. 7-13, Pg ID 905-07.)

That concluded the matter, but Petitioner raised the issue again in his motion for relief from judgment, claiming that defense counsel should have insisted on a mistrial.  In ruling on Petitioner's claim, the trial court stated that it had reviewed the record a second time and found no merit in the motion for a mistrial.  The court concluded that defense

counsel's failure to re-address the motion for mistrial did not amount to deficient performance because the motion lacked merit in the first place.

This Court likewise finds no merit in Petitioner's claim. Although defense counsel could have renewed his motion for a mistrial, the trial court had already ruled in his favor on the issue of whether Detective Carlson could comment on the consistency of Kevin Simon's statements. In doing so, the trial court implicitly found that a mistrial was not warranted. A second or renewed motion for a mistrial in all likelihood would have been denied, and attorneys are not required to file futile motions to avoid a claim of ineffective assistance. *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984). Consequently, defense counsel's omission did not amount to deficient performance, and the allegedly deficient performance did not prejudice the defense.

### 2. Failure to Consult and Produce a Medical Doctor

Petitioner alleges that trial counsel should have consulted and produced Dr. Kurt Martinson, who wrote in his emergency room report that Jimahle Donald died from a bullet that entered his abdomen. Petitioner asserts that, had Dr. Martinson testified, he could have rebutted Dr. Virani's testimony that the bullet entered Donald's back. According to Petitioner, Dr. Martinson's testimony would have strengthened the defense case and weakened the prosecution's theory that the shooting of Donald was premeditated and deliberate.

The state trial court addressed Petitioner's claim in its order denying Petitioner's motion for relief from judgment. The trial court concluded that Dr. Martinson's

26

testimony would not have been to Petitioner's advantage and that the failure to introduce Dr. Martinson's testimony did not demonstrate ineffective assistance by counsel.

This Court agrees, because the prosecutor questioned Dr. Virani on direct examination about Dr. Martinson's findings, and Dr. Virani explained that emergency room doctors are trained to save lives rather than to distinguish between entrance and exit wounds.  (9/22/06 Trial Tr. at 89-90, ECF No. 7-10, Pg ID 705.)  To his credit, defense counsel followed up on this issue during cross-examination and elicited Dr. Virani's admission that the emergency room doctor had reached the opposite conclusion as Dr. Virani on the matter of the direction of the bullet.  (*Id*. at 103-04, ECF No. 7-10, Pg ID 709.)

If consulted or called as a defense witness, Dr. Martinson might have admitted that he was not trained to distinguish entrance and exit wounds.  Therefore, defense counsel's failure to consult and produce Dr. Martinson did not amount to deficient performance.  Even if it did, the alleged deficiency did not prejudice the defense, because two eyewitnesses (Devon Bishop and Demetre Merrill) testified that Petitioner chased Jimahle Donald and shot him in the back.

### 3.  Failure to Produce an Alibi Witness

In his final claim about trial counsel, Petitioner alleges that counsel should have produced his alibi witness, Nicole Riley, who would have testified that Petitioner was with her on the afternoon of January 3, 2006, and until 8:00 p.m. that day.  The state trial court did not address this claim even though Petitioner raised it in his motion for relief

from judgment.  This Court, however, concludes for the following reasons that the claim

lacks merit.

The record indicates that the shootings of Patrick Price and Jimahle Donald

occurred about 6:20 p.m. on January 3, 2006.  (9/28/06 Trial Tr., at 91-92, ECF No. 7-13,

Pg ID 892-93.)  Thus, Ms. Riley's testimony would have been relevant, and "the failure

to call a known alibi witness generally would constitute ineffective assistance of

counsel."  *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004); *accord Blackburn v.*

*Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (concluding that the failure to investigate a

known and potentially important alibi witness was outside the range of professionally

competent assistance); *Pillette v. Berghuis*, 408 F. App'x 873, 884 (6th Cir. 2010)

(stating that "[t]he failure to call favorable witnesses can amount to ineffective assistance

where it results in prejudice to the defense").

Nevertheless, "strategic choices made after thorough investigation of law and facts

relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690.

An attorney's duty is "to make reasonable investigations or to make a reasonable decision

that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.

Petitioner states that he informed trial counsel about Ms. Riley, but he also states

that counsel spoke with Ms. Riley in his office and then informed Petitioner that Riley

would not make a good witness because she appeared to have been drinking and that her

appearance and demeanor would not be helpful to the defense.  Petitioner further alleges

that his mother spoke with defense counsel about Petitioner's alibi and that counsel told

28

his mother he was uncertain about Ms. Riley's character and did not think she would be a good witness. *See* Memorandum of Law in Support of Pet. for Writ of Habeas Corpus, at 68-69. In light of these allegations, it is obvious that trial counsel investigated Petitioner's alibi defense and made a strategic decision not to call Ms. Riley.

Furthermore, Petitioner has not submitted a signed affidavit from Ms. Riley explaining what she would have said at trial and that she was willing and able to testify as an alibi witness. An attorney is not ineffective for failing to call an alleged alibi witness where there is no affidavit from the witness or other evidence establishing that the witness would have provided helpful testimony for the defense. *Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000).

### 4.  Conclusion on Petitioner's Ineffective-Assistance-of-Counsel Claim

Defense counsel's performance was not deficient and the alleged deficiencies did not prejudice the defense. Furthermore, the state courts' rejection of Petitioner's claim did not result in decisions that were contrary to, or unreasonable applications of, *Strickland*. Habeas relief is not warranted on Petitioner's ineffective-assistance-of-counsel claim.

### E.  The Trial Court

The fifth habeas claim alleges that the trial court failed to govern the trial in a proper manner and demonstrated partiality in its rulings on defense counsel's objections. More specifically, Petitioner claims that the trial court failed to rule on defense counsel's

29

motion for a mistrial despite defense counsel's objection that the prosecutor was vouching for his witnesses.

The trial court addressed Petitioner's claim in its order denying Petitioner's motion for relief from judgment and concluded that the claim lacked merit.  In reaching this conclusion, the state court explained that it had reviewed the transcripts and determined that, for each objection made, the court had considered the Michigan Rules of Evidence and ruled accordingly.

To prevail on his judicial bias claim, Petitioner must show "there was bias, or such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964).  "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . .  Almost invariably, they are proper grounds for appeal, not for recusal." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Additionally, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id*.  A judge's ordinary efforts at courtroom administration remain immune from a charge of bias or partiality.  *Id*. at 556.

As noted above, the trial court ruled in Petitioner's favor on the issue of prosecutorial vouching and whether the detective could testify about another witness's

30

testimony.  The trial court implicitly denied the motion for a mistrial by continuing with the proceedings.  The court's ruling and failure to grant a mistrial are not a valid basis for a claim of bias, *Liteky*, 510 U.S. at 555, and the record fails to show any antagonism toward Petitioner, such that the court could not fairly decide the issues.  Petitioner therefore has no right to relief on his judicial-bias claim.

## F.  The Prosecutor

The sixth habeas claim alleges prosecutorial misconduct.  Petitioner claims that the prosecutor:  (1) introduced highly prejudicial evidence; (2) argued matters not in evidence, vouched for his witnesses, and invaded the province of the jury; and (3) made prejudicial comments unrelated to Petitioner's case.  The state trial court concluded on review of Petitioner's claim about the prosecutor that there was no misconduct.  The trial court also said that the prosecutor's statements were harmless and that they did not affect the jury's decision, nor deprive Petitioner of a fair trial.

On habeas review, "[c]laims of prosecutorial misconduct are reviewed deferentially."  *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  "The relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' "  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).

31

"In deciding whether prosecutorial misconduct mandates that habeas relief be granted, the Court must apply the harmless error standard." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997).  An error is harmless unless it had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

**1. Prejudicial Evidence**

Petitioner alleges that the prosecutor made improper comments about gang warfare and introduced highly prejudicial evidence regarding gang activity, including two tee shirts and a bulletproof vest that the police found at Petitioner's residence.  According to Petitioner there was no evidence that the shootings were gang-related, and the prosecutor was bent on misleading the jurors and prejudicing Petitioner's right to a fair trial.  Petitioner further alleges that the strength of the evidence against him was anything but strong and that he likely was found guilty on the basis of his alleged gang affiliation, rather than the evidence.

Some of the testimony and comments at trial did pertain to gangs, but contrary to Petitioner's assertions, there was evidence that the shootings were gang-related.  Devon Bishop, for example, testified that he, Petitioner, and Jordan Cramton were associated with the North Side gang.  (9/22/06 Trial Tr. at 60, ECF No. 7-10, Pg ID 698.)

In addition, Demetre Merrill testified that:  all the young men in the Oldsmobile Bravada on January 3, 2006, were members of the North Side; that the North Side and South Side did not get along with each other due to a turf or "territory war type thing;"

that the group went to the South Side on January 3 and stayed in the South Side neighborhood when they saw someone that Petitioner did not like and two other guys walking down the street; that "D-Black" was affiliated with the South Side gang and that Petitioner got out of the vehicle near D-Black's house and fired a gunshot; and that he (Merrill) initially did not want to say anything to the police because gang members are not supposed to say what happened.  (9/27/06 Trial Tr. at 16-23, 36,  ECF No. 7-12 Pg ID 815-817, 820.)

The evidence was relevant, moreover, to show a motive for the shootings.  As the Michigan Court of Appeals pointed out, this "case involve[d] a cycle of gang violence between Saginaw's rival North Side and South Side gangs."  *Gaines*, Michigan Court of Appeals No. 274721, 2009 WL 103229, at *1.  And because the evidence was relevant, it was proper.  *Blackmon v. Booker*, 696 F.3d 536, 557 (6th Cir. 2012).

Even if the prosecutor's emphasis on gangs was excessive or improper, Petitioner incorrectly asserts that the strength of the evidence was anything but strong.  The evidence against him was overwhelming, and it appears that the jury reached its verdict on the strength of the evidence, rather than the prosecutor's comments and elicitation of testimony about gangs.  Accordingly, the prosecutor's alleged misconduct was harmless.

### 2.  Matters Not in Evidence and Vouching

Petitioner alleges next that the prosecutor argued matters not in evidence, bolstered the evidence, vouched for his witnesses, and invaded the province of the jury. The basis for this argument is the prosecutor's elicitation of testimony from Detective

33

Carlson that the witnesses he interviewed were cooperative.  As noted above, however, the trial court sustained defense counsel's objection to prosecutorial vouching.  (9/28/06 Trial Tr. at 142-49, ECF No. 7-13, Pg ID 905-07.)

Furthermore, Detective Carlson never got a chance to answer the prosecutor's question about whether Kevin Simon's testimony was consistent with what he told the police, and the trial court instructed the jurors that the attorneys' questions were not evidence.  (9/29/06 Trial Tr. at 90, ECF No. 7-14, Pg ID 952.)  Thus, the alleged misconduct was harmless.

### 3.  Other Comments

In his third and final claim about the prosecutor, Petitioner maintains that the prosecutor made prejudicial comments during *voir dire*, in his opening statement, and in his closing argument.  Specifically, Petitioner asserts that the prosecutor vouched for the co-conspirators by stating that they testified without consideration of the penalty for their crimes.  Petitioner also claims that the prosecutor made a civic duty argument when he mentioned the senseless shootings in Saginaw.

The shootings were senseless, and the comment about the co-conspirators testifying without a sentencing agreement was based on the evidence.  Therefore, those comments were not improper.

Petitioner also objects to the prosecutor's comments about gangs and gang-related evidence found at Petitioner's residence.  As an example of misconduct, Petitioner quotes

34

the following portion of the prosecutor's closing argument where the prosecutor

described Petitioner as

> [a] soldier, a soldier because what this is is a war.  It's a war on the streets
> that this young man is involved in.  He's a soldier.  And there are territories
> and pieces of ground that are being protected and maintained by the
> soldiers in this war.  And that is the frame of mind that this young man is
> engaged in.  This is his world.
>
> The primary concern that the People have about this case and your decision
> making is that you focus on the evidence.  He's a young man.  There's no
> question about that.  He's young.  Is he much younger than some of the
> young men who have been sent off to wars in the past?  Not much.  Young
> men are always sent off to war, called upon to do their duty.
>
> His duty, though, is to the North Side Gang members that he associates
> with.  That's where his duty lies.  A soldier.  A soldier with a name, a
> victim in the game.  A victim in a game, a game in which people die.  Life
> won't be the same without my right hand man, Deondre and the others.
> And a game that involved paintball guns?  Is this to protect him from a
> paintball?  Or bullets that are coming from South Siders and the enemy?

(9/29/06 Trial Tr. at 31-32, ECF No. 7-14, Pg ID 938.)

Although the prosecutor may have exaggerated somewhat by describing Petitioner

as a soldier and comparing the facts in his case to a war, the prosecutor obviously was

trying to help the jury understand Petitioner's environment.  To his credit, the prosecutor

made a point of urging the jurors to focus on the evidence.

The trial court, moreover, instructed the jurors that the attorneys' arguments were

not evidence and that they were meant to help the jurors understand the evidence and

each side's legal theories.  (*Id*. at 89, ECF No. 7-14, Pg ID 952.)  "[J]uries are presumed

to follow their instructions."  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  Therefore,

the prosecutor's argument could not have had a "substantial and injurious effect or influence" on the jury's verdict, and was harmless. *Brecht*, 507 U.S. at 623.

To summarize, the prosecutor's conduct did not infect the trial with such unfairness as to make the resulting conviction a denial of due process. Even if the prosecutor's conduct were deemed improper, the improprieties were harmless, given the trial court's jury instruction about the attorneys' arguments and the strength of the evidence against Petitioner. The state courts' rejection of Petitioner's prosecutorial-misconduct claim was objectively reasonable, and habeas relief is not warranted.

## G. The Cumulative Effect of Errors

In his seventh and final claim, Petitioner alleges that the cumulative effect of trial errors deprived him of due process and a fair trial. Although no state court adjudicated this claim on the merits, this Court rejects the claim because it is not a cognizable claim on habeas corpus review. *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011), *cert. denied sub nom Sheppard v. Robinson*, 132 S. Ct. 2751 (2012).

## IV. Conclusion

The state-court orders and opinions in this case were not objectively unreasonable, nor "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. The Court therefore DENIES the petition for writ of habeas corpus.

36

### V.  Certificate of Appealability

Before Petitioner may appeal this Court's decision, a certificate of appealability must issue.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists could not debate the Court's assessment of Petitioner's claims.  The Court therefore declines to issue a certificate of appealability.  Petitioner nevertheless may proceed *in forma pauperis* on appeal if he appeals this decision, because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 23, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on

s/Deborah Tofil
Deborah Tofil
Case Manager (313)234-5122

37